JOURNAL ENTRY and OPINION
{¶ 1} The City of Cleveland filed three separate lawsuits in connection with its claim for damages arising out of the failure of utility poles installed as part of its electrical System Expansion Program: the first, the Thomasson litigation; the second, the Norpac
litigation; and the third, the OMG litigation.
{¶ 2} Further, the city has filed three separate notices of appeal, which we have consolidated for hearing and review, arising from these lawsuits: the first appeal, Case No. 78706, arises from the court's entry of a directed verdict journalized on October 2, 2000 and its previous orders granting summary judgment to several defendants, which effectively terminated the Norpac litigation; the second appeal, Case No. 78871, arises from eight nunc pro tunc journal entries filed by the court in the Norpac litigation, which supplemented its entry of directed verdict with additional analysis; and the third appeal, Case No. 79595, arises from the court's order journalized on April 25, 2001, which dismissed with prejudice all of the city's claims filed in the OMG
litigation on the basis of res judicata.
{¶ 3} Our review of the assignments of error presented by the city shows that none of them relates to the OMG appeal in Case No. 79595; accordingly, we are unable to conduct a review of that case, and we therefore dismiss that appeal. See App.R. 12(A)(1)(b).
{¶ 4} The two remaining appeals, Cases No. 78706 and 78871, both arise from Common Pleas Case No. 391217, the Norpac litigation. After reviewing the several causes of action presented by the city in that case, we have determined that all are barred by the respective statutes of limitations except for the city's UCC claims for seventy-one poles shipped after September 10, 1995 and for its fraud claim against OMG Americas, Inc. and OM Group, Inc. Our review, moreover, reveals that the city failed to establish the essential elements of its fraud claim and, on these grounds, we affirm the judgment of the trial court, which granted a directed verdict in favor of all defendants on all of the city's claims.
 {¶ 5} THE FACTS
{¶ 6} These cases stem from the failure of utility poles purchased by the city and by its contractors for use as part of what is referred to as the "C-5" and "C-9" phases of the city's System Expansion Program. In connection with these failures, the city sued, inter alia, The Leader Electric Supply Co. and Wesco Distribution, Inc., which are local utility pole brokers; North Pacific Group, Inc. ("Norpac") and Thomasson Lumber Co., which are national utility pole suppliers; Cahaba Pressure Treated Forest Products, Inc. and Olon Belcher Lumber Co., which are treaters of utility poles; and OMG Americas, Inc. ("OMGA"), which manufactures copper naphthenate, a chemical used to treat the poles, and OM Group, Inc. ("OMG"), a holding company which owns one hundred percent of the shares of OMGA.
{¶ 7} On February 14, 1992, the city entered into what is referred to as the C-5 contract with a general contractor, L.E. Myers Co., to institute the C-5 phase of its System Expansion Program; on December 18, 1992, the city contracted with F.A. Tucker Corp., another general contractor, for the C-9 phrase of the program. Both the C-5 and the C-9 contracts required the contractors to purchase poles treated with copper naphthenate. In addition, these contracts specified that the utility poles retain an average of at least 0.06 pounds of copper naphthenate per cubic foot and that the chemical penetrate at least two and one-half inches into the wood.
{¶ 8} Moreover, the record reflects that the C-5 and C-9 contracts contained the following language limiting a subcontractor's liability:
 {¶ 9} The Contractor shall be and remain solely responsible to the City for the acts or faults of his subcontractor and of such subcontractor's officers, agent and employees, each of whom shall, for this purpose, be deemed to be the agent or employee of the contractor to the extent of his subcontract. * * * The Contractor and subcontractor shall jointly and severally agree that no obligation upon the City of Cleveland is thereby created to pay to, or see to the payment of any sums to any subcontractor.
{¶ 10} To fulfill its obligations under the C-5 contract, Myers purchased utility poles from Leader, which in turn purchased them from Hamby-Young Power Supply Products, Inc., a company acquired by Wesco in May 1996. Hamby-Young purchased these poles, which had been treated with copper naphthenate by Cahaba, from Thomasson.
{¶ 11} Regarding the C-9 contract, the record reveals that Tucker purchased utility poles, which had also been treated with copper naphthenate by Cahaba, from Leader, which had purchased them from Norpac.
{¶ 12} Independent from the C-5 and C-9 contracts, the city also entered into a requirements contract in 1989 with Hamby-Young to purchase other poles, which were treated with copper naphthenate by Cahaba and Olon Belcher and purchased by Hamby-Young from Thomasson. The city also entered into additional requirements contracts on August 25, 1992 and on October 31, 1994, respectively, to purchase poles treated by Cahaba and Olon Belcher from Leader, which in turn acquired them from Thomasson and Norpac.
{¶ 13} As in the C-5 and C-9 contracts, these contracts also required the treatment of the poles by copper naphthenate and specified the same retainment and penetration level of the chemical. With regard to these poles, the city further specified, in the Cleveland Public Power Specification No. CPWP-95, "Specifications for Wood Poles", Section D.4.3, that the city had the rights and obligations to inspect and reject nonconforming poles. Nowhere does the record reveal, however, that the city ever exercised its inspection or rejection rights.
{¶ 14} In the fall of 1995, the city's Deputy Project Director for Safety, Dane Spankle, became aware of utility pole failure: the city's activity log regarding the pole project recorded the earliest pole failure in September, 1995; a letter from Spankle to the city's Safety Project Engineer, Jerry Salko, dated December 5, 1995 stated the following:
 {¶ 15} For the past several months we have been having trouble with certain poles. The poles are from Thomasson Lumber Company and are between 5 and 6 years old. * * * The poles have excessive decay in the core. * * * [Thomasson Lumber's] inspection entailed observation of the general condition of the poles, hammer testing the poles for sound, and core sampling the poles to assess decay and the depth of preservative penetration.
 {¶ 16} THE PROCEDURAL HISTORY
{¶ 17} On February 14, 1997, the city filed its first action in connection with the failed utility poles, styled City of Cleveland d/b/aCleveland Public Power v. Thomasson Lumber Co., et al., Cuyahoga County Court of Common Pleas Case No. 330472 ("the Thomasson litigation"), against seventeen defendants: Thomasson Lumber Co.; Northern Pacific Lumber Co.; Cahaba Pressure Treated Forest Products, Inc.; Olon Belcher Lumber Co., Inc.; McCallum Inspection Co.; A.W. Williams Inspection Co.; OM Group, Inc.; OMG Americas, Inc.; Mooney Chemical, Inc.; The Leader Electric Supply Co.; Electrical Equipment Co.; R.W. Beck Associates; Polytech, Inc.; Beck/Polytech; The Guaranty Company of North America; F.A. Tucker Corp.; and L.E. Meyers Co. In its complaint, the city alleged damages arising from the failed utility poles purchased during the city's System Expansion Program pursuant to the C-5 and C-9 contracts, as well as the requirements contracts.
{¶ 18} In 1998, as a result of two separate federal lawsuits where GCNA[1] and Myers sued the city for disputes arising out of the C-9 and C-5 contracts, respectively,[2] the city filed counterclaims and ultimately settled those lawsuits and received a substantial settlement of an aggregate $13,600,000.00. In accordance with the settlement agreements signed in the federal litigations, the city released its C-5 and C-9 claims against Myers, Tucker, GCNA, and its engineers; consequently, the city dismissed these parties from the pending Thomasson action.
{¶ 19} On September 10, 1999, however, while the Thomasson case remained pending,[3] the city filed a second complaint in connection with the pole failures, styled The City of Cleveland d/b/a ClevelandPublic Power v. North Pacific Group, Inc., et al., Cuyahoga County Court of Common Pleas Case No. 391217 ("the Norpac litigation"), naming Norpac, Cahaba, OMG, OMGA, and Leader as defendants. That complaint, as filed, only raised the C-9 contract claims.
{¶ 20} The record also reflects that the court, in the Thomasson
litigation, granted summary judgment to OMG on May 9, 1999 and to Leader on October 19, 1999, adding to the latter order, by nunc pro tunc entry, the "no just cause for delay" language of 54(B). The city, however, never appealed from either summary judgment order.
{¶ 21} Also, on October 19, 1999, prior to commencing trial against the remaining defendants in the Thomasson case, the city voluntarily dismissed that suit pursuant to Civ.R. 41(A)(1)(a) and, on that same day, filed its First Amended Complaint in the Norpac action, adding the requirements contracts claims and the C-5 contract claims to the Norpac case and also adding Thomasson, Olon Belcher, and Wesco as defendants in the Norpac case.
{¶ 22} In its amended Norpac action, the city alleged similar claims as it had in the Thomasson action: in particular, it asserted breach of contract claims as an intended third-party beneficiary against Thomasson, Norpac, Leader and Wesco (Count I); negligence (Count II), strict liability in tort as stated in Section 402(A) of the Restatement of Torts 2d (Count III), breach of express and implied warranty (Count IV), and Ohio Products Liability Act claim (Count V) against all defendants; and fraud against OMG and OMGA (Count VI).
{¶ 23} The defendants subsequently twice moved for summary judgment based on the statue of limitations, but both times the court denied their motions; in its September 6, 2000 order, the court stated the Norpac action "shall go forward as to the C-5 and requirements contracts."
{¶ 24} On September 8, 2000, the court commenced a jury trial in the Norpac case. At the conclusion of the city's case in chief, however, the court directed a verdict in favor of all defendants.[4]
{¶ 25} On October 17, 2000, the city filed its appeal from that order, known as Appellate Case No. 78706.
{¶ 26} The next day, on October 18, 2000, the city filed a third complaint, styled City of Cleveland d/b/a Cleveland Public Power v. OMGroup, Inc., et al., Cuyahoga County Court of Common Pleas Case No. 421337 ("the OMG litigation"), naming the same parties as in the Norpac
action, except for Norpac.
{¶ 27} Thereafter, on October 20, 2000 and October 25, 2000, the trial court filed eight nunc pro tunc entries in the Norpac case, offering additional analysis regarding its directed verdict: it concluded that the city's express warranty claims expired on September 10, 1999, except for seventy-one poles shipped after September 10, 1995 pursuant to the 1994 requirements contract; in addition, it decided that both the settlement releases given in the federal cases and the contractual language in the C-5 and C-9 contracts limiting the subcontractors' liability precluded the city claims against the subcontractors.
{¶ 28} In response to these nunc pro tunc orders entered in theNorpac case, on November 20, 2000, the city filed a second notice of appeal, known as Appellate Case No. 78871.
{¶ 29} Finally, on April 25, 2001, the trial court granted the defendants' motions to dismiss the OMG action on the ground of res judicata. The city also appealed that decision, known as Appellate Case No. 79595, and we consolidated these three appeals — No. 78706, No. 78871, and No. 79595 — for purposes of briefing, oral argument, and review.
{¶ 30} As previously indicated, our review of Appellate Case No. 79595 reveals that no assignment of error specifically addresses the res judicata judgment of the court in the OMG action; therefore, we have nothing before us for review, and we hereby dismiss that appeal.
{¶ 31} On the remaining appeals in 78706 and 78871, the city raises eleven assignments of error[5] challenging the directed verdict entered on all of its claims, which, as the record reflects, the court granted based on the contractual language limiting the subcontractors' liability, on the releases granted to the contractors, and on the statutes of limitations regarding the express warranty claims. In their cross-appeal, Cahaba, OMG, and OMGA assert that the majority of the city's claims are barred by the statutes of limitations. Upon a careful review of the record, we agree. Thus, rather than considering the merits of the assignments of error presented by the city, we first address the statutes of limitations issue in the instant appeals.
 {¶ 32} STATUTE OF LIMITATIONS {¶ 33} 1. LAW
{¶ 34} We begin by reviewing the applicable statutes of limitations for the various claims raised by the city: negligence, strict liability, Ohio Product Liability Act claims, warranty claims, and breach of contract.
{¶ 35} Claims of negligence and strict liability sound in tort and are governed by a two-year statute of limitations imposed by R.C. 2305.10. See Tingler v. Buckeye Fireworks Manufacturing Co., Inc. (1983),12 Ohio App.3d 58, 59, 465 N.E.2d 1336, 1338. That statute provides:
 {¶ 36} § 2305.10 Bodily injury or injury to personal property.
 {¶ 37} An action for bodily injury or injuring personal property shall be brought within two years after the cause thereof arose.[6]
{¶ 38} A cause of action "accrues" under R.C. 2305.10 when the injury to the plaintiff occurs. See, e.g., Benge v. Jones (1992),80 Ohio App.3d 420, 609 N.E.2d 581.
{¶ 39} Regarding the city's claims for breach of warranty under the UCC, R.C. 1302.98 provides a four-year statute of limitations as follows:
 {¶ 40} (A) An action for breach of any contract for sale must be commenced within four years after the cause of action has accrued * * *.
 {¶ 41} (B) A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.
{¶ 42} Thus, unless there is "a warranty explicitly extending to future performance," the cause of action accrues at the time of delivery and the statutory period runs four years from that time.
{¶ 43} Regarding the Ohio Products liability Act ("OPLA") claim pursuant to R.C. 2307.73, the court in McAuliffe v. Western States ImportCo., Inc. (1995), 72 Ohio St.3d 534, 540, 651 N.E.2d 957, 961, stated that OPLA claims are not governed by the six-year statutory period applicable to rights created by statute but, rather, by the applicable statute of limitations governing the common-law product liability cause of action. That statutory period is either the two-year provision in R.C. 2305.10 or the four-year provision in R.C. 1302.98, depending on the character of loss; in Sun Refining and Marketing Co. v. Crosby Valve Gage Co. (1994), 68 Ohio St.3d 397, 440, 627 N.E.2d 552, 555, the court stated the following:
 {¶ 44} [I]n a products-liability action between sophisticated commercial parties, the character of the loss determines the applicable statute of limitations. Losses due to a diminishing of the expected benefit of the bargain fall under the statute of limitations set forth in R.C. 1302.98 (UCC 2-725). Causes of action for losses resulting from damage to property outside the original bargain are controlled by the statute of limitations in either R.C. 2305.10 or 2305.09(D).[7]
{¶ 45} The city's OPLA claim alleges both a defective product, i.e. diminishing of the expected benefit or what is referred to as economic loss, as well as damages to other property; therefore, the four-year period applies to the claim of reduced benefit of the bargain and the two-year period applies to the claim of loss to other property.
{¶ 46} Regarding the city's breach of contract claim against Leader, Norpac, Thomasson, and Wesco, R.C. 2305.06 establishes the statute-of-limitations period governing written contracts:
 {¶ 47} Except as provided in section 1302.98 of the Revised Code, an action upon a specialty or an agreement, contract, or promise in writing shall be brought within fifteen years after the cause thereof accrued. (Emphasis added.)
{¶ 48} Because this provision excludes a contract for sale of goods, the courts have generally applied a four-year period for such contracts. See The May Company v. Trusnik (1977), 54 Ohio App.2d 71,375 N.E.2d 72 (the four-year statute of limitations in R.C. 1302.98
governs a written contract for the sale of goods; the UCC statute of limitations specifically relating to sales should prevail over the general statute of limitations governing contracts in writing). Therefore, the city's contract claims independent of its UCC claims, if any, are governed by a four-year statute of limitations imposed by R.C.1302.98, as they involved transactions in the sale of goods.
{¶ 49} Finally, R.C. 2305.09 states:
 {¶ 50} An action for any of the following causes shall be brought within four years after the cause thereof accrued:
 * * * {¶ 51} (D) For relief on the ground of fraud.
 {¶ 52} 2. APPLICATION OF THE STATUTE OF LIMITATIONS
{¶ 53} Our review leads us to conclude that the time for filing the city's negligence, strict liability, and OPLA claims relating to loss from damages to other property expired two years after the occurrence of injury. As the record indicates, the first pole failure occurred sometime in the fall of 1995, as reflected by the above-quoted letter from Dane Spankle to Jerry Salko, the city's project engineer.
{¶ 54} As for the UCC claims and the OPLA claims relating to a remedy for the diminished benefit of the bargain, i.e. economic loss, a cause of action for these kinds of claims accrues at the time of delivery of the goods. The record indicates the following dates of last delivery under the various contracts: C-9 contract, November 29, 1994; C-5 contract, April 13, 1993; 1992 requirements contract, October 5, 1994; and 1994 requirements contract, January 2, 1996. For this last contract, seventy-one poles were delivered after September 10, 1995.[8]
{¶ 55} Here, the record reflects that the city filed its first action regarding claims for copper naphthenate pole failure, theThomasson action, on February 14, 1997, alleging damages under the C-5, C-9, and the requirements contracts. The city, however, voluntarily dismissed that action pursuant to Civ.R. 41(A)(1)(a) on October 19, 1999.
{¶ 56} The record further reflects the city filed the instant action on September 10, 1999, initially asserting only C-9 claims but later adding the C-5 and the requirements contract claims.
{¶ 57} Given the applicable two-year and four-year statutory period, the city's knowledge of the earliest utility pole failure in the fall of 1995 as reflected in Spankle's letter to Salko, and the delivery of the vast majority of the poles prior to September 10, 1995, it appears that when the city filed its claims for the copper naphthenate pole failure in the Norpac action on September 10, 1999, all of its claims had already expired except for its UCC claims regarding the seventy-one poles shipped after September 10, 1995[9] and except for its fraud claim against OMG and OMGA.
{¶ 58} In connection with its UCC causes of action, which, pursuant to R.C. 1302.98, accrued at delivery unless there existed "a warranty explicitly extending to future performance," the only contract alleged by the city to contain such a warranty is the 1988 requirements contract with Hamby-Young. Regarding this contract, the record shows that several purchase orders pursuant to this contract contained a shipping document which included a chart showing poles treated with copper naphthenate to have an average life of twenty-two years or twenty-seven years, depending on "wood species, size and service conditions." This chart, without more, is not "a warranty explicitly extending to future performance" as required by the statute in order for the statutory period to accrue at the time of discovery of breach rather than at the time of delivery. Since the last delivery under this requirements contract occurred on December 27, 1991, the statutory time ran four years from that date for the poles purchased under this contract, contrary to the city's claim.
{¶ 59} The record further reflects that every defendant except for Wesco filed a motion for summary judgment on the basis of the statute of limitations. In response to these motions, the city argued that it had "refiled" its C-5 and the requirements contract claims as permitted by the savings statute when it filed its Amended Complaint in the Norpac
action, thus making the filing date of the C-5 and requirements claims February 14, 1997, not September 10, 1999, for statute-of-limitations purposes.[10] In other words, the city argued that since it filed its claims timely in the Thomasson action, its refiling of the C-5 and the requirements contracts claims from that case, by operation of the savings statute, should not be time barred.
{¶ 60} The record indicates the trial court denied the defendants' motions for summary judgment, allowing the case to proceed, and stated in its September 6, 2000 order:
 {¶ 61} Defendants contend that the Plaintiff's attempt to comply with the Savings Statute (R.C. § 2305.19) fails, in that Plaintiff did not file its claims in a new case, but instead elected to re-file its claims as an Amended Complaint in another action already pending before this Court. This issue appears to be one of first impression, as no precedent has been suggested by any of the parties. Construing the savings statute and the civil rules narrowly, the Court finds that the C-5 and Requirements contracts argument advanced by the Defendant may be technically correct; however, it is clear to this Court that, if this is true, the City's attempt to re-file its claims in the context of the pending action (Case No. 391217) would necessarily be a nullity ab initio. If so, it logically follows that the Plaintiff would have several weeks from this date in which to refile under the Savings Statute. (One year from October 19, 1999) This would obviously result only in yet more delay in what already has become protracted litigation, and with no actual benefit to either side. Accordingly, this Court finds it preferable for all concerned to allow these re-filed claims to stand and the case shall go forward as to the C-5 and Requirements contracts. (Emphasis in original.)
{¶ 62} The issue for our resolution here, then, concerns whether the court correctly permitted the city to assert its expired C-5 and requirements contracts claims by purportedly using the savings statute.
{¶ 63} R.C. 2305.19, the savings statute, provides, in relevant part:
 {¶ 64} In an action commenced * * * if the plaintiff fails otherwise than upon the merits, and the time limited for the commencement of such action at the date of * * * failure has expired, the plaintiff * * * may commence a new action within one year after such date. (Emphasis added.)
{¶ 65} Interpreting the statute, the court in Cero Realty Corp.v. American Mfrs. Mut. Ins. Co. (1960), 171 Ohio St. 82, 85,167 N.E.2d 774, 777, set forth four predicate requirements for the application of the savings statute: (1) an action which is timely commenced; (2) failure of plaintiff in the action "otherwise than upon the merits"; (3) expiration of the time limit for commencing the action at the time of failure; and (4) the right of the plaintiff to commence a new action within one year of such failure.
{¶ 66} Before we consider the application of R.C. 2305.19 to the instant action, we note first that despite the language of R.C.2305.19, the city could not refile any expired UCC claims because those are governed by R.C. 1302.98 (UCC-2-725), which sets forth its own savings provision as follows:
 {¶ 67} (C) Where an action commenced within the time limited by division (A) of this section is so terminated as to leave available a remedy by another action for the same breach, such other action may be commenced after the expiration of the time limited and within six months after the termination of the first action unless the termination resulted from voluntary discontinuance or from dismissal for failure or neglect to prosecute. (Emphasis added.)
{¶ 68} Our review of this statute indicates that it provides a six-month, rather than a one-year, period as set forth in R.C. 2305.19
for refiling an expired UCC claim, unless the termination resulted fromvoluntary discontinuance; for a voluntary discontinuance, the statute does not permit the refiling of an expired claim. See, InternationalPeriodical Distributor v. Bizmart (Feb. 1, 2001), Cuyahoga App. No. 77787, unreported (R.C. 1302.98[C] provides a six-month extension only where the previous dismissal is not a result of voluntary discontinuance).
{¶ 69} Thus when the city voluntarily dismissed the Thomasson case on October 19, 1999, R.C. 1302.98 barred the city from refiling any expired UCC claims.
{¶ 70} Regarding the application of the savings statute, R.C.2305.19, to the remaining claims, the record reflects the Thomasson
action failed otherwise "than upon the merits" due to the city's voluntary dismissal of that case, and the asserted claims had expired at the time of the dismissal, i.e., on October 19, 1999.[11] The city should have complied with R.C. 2305.19, which required it to "commence a new action" within one year of the date of the voluntary dismissal. The city failed to comply with that statute in two respects.
{¶ 71} First, as directed by Civ.R. 3(A), "a civil action is commenced by filing a complaint with the court." The city did not cite any authority permitting us to construe the amendment of an already existing action as the "commencement of a new action," and we are aware of none.
{¶ 72} Second, the city's amendment of the Norpac complaint relates back to the date that action was originally filed, i.e. September 10, 1999. See Civ.R. 15(C). Thus, the purported refiling of the C-5 and requirements contracts claims from the Thomasson action under the savings statute predated the dismissal of that action, on October 19, 1999, rather than occurring within a year of that date, as required by the statute.
{¶ 73} Therefore, the city's attempt to refile the C-5 and requirements contracts claims through the amendment of the Norpac action fell short of the requirements of R.C. 2305.19 and Civ.R. 3(A). AccordRoof v. Elias (Apr. 11, 1997), Lucas App. No. L-96-207, unreported (plaintiff's amendment of a complaint adding a defendant whom she had earlier dismissed does not constitute the commencement of a new action for the purposes of R.C. 2305.19).
{¶ 74} Although we recognize the trial court's concern for efficient judicial administration in permitting the city to assert the C-5 and requirements contracts claims under the Norpac action without compliance with the savings statute, the court did not possess the inherent power to do so. Consequently, the city presented its C-5 and requirements contracts claims on September 10, 1999, not on February 14, 1997, as it alleged; hence, except for its UCC claims for the seventy-one poles shipped after September 10, 1995 and its fraud claim against OMG and OMGA, the majority of its utility pole claims had already expired and, therefore, the court correctly granted a directed verdict pursuant to Civ.R. 50(A)(4)[12] on these claims.
{¶ 75} Regarding the seventy-one poles, our review of the record shows it is devoid of any evidence establishing failure of any of the poles delivered after September 10, 1995. Without that showing, any claims regarding these poles must fail. Hence a directed verdict for all of the city's UCC claims is proper.
{¶ 76} Our resolution renders moot all of the city's assignments of error except for the assignment relating to its fraud claim against OMG and OMGA. See App.R. 12(A)(c).
 {¶ 77} FRAUD
{¶ 78} The city's seventh assignment of error states:
 {¶ 79} THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN FAVOR OF OMG ON THE CITY'S EXPRESS WARRANTY AND FRAUD CLAIMS.
{¶ 80} In challenging the court's directed verdict, the city contends it has met its evidentiary burden of establishing the requisite elements for this claim; OMG and OMGA assert that the city has failed in this regard. The issue for our resolution, then, concerns whether the city has produced evidence to demonstrate its fraud claim.
{¶ 81} Fraud is predicated on the following five elements: (1) a material false representation; (2) made with knowledge of its falsity; (3) with the intent to induce reliance; (4) justifiable reliance upon the misrepresentation by the plaintiff; and (5) a resulting injury proximately caused by the reliance.[13] See Gaines v.Preterm-Cleveland, Inc. (1987), 33 Ohio St.3d 54, 55, 514 N.E.2d 709,712.
{¶ 82} Here, the record indicates that through OMGA's sales brochures, it represented to the city the following:
 {¶ 83} M-GUARD equals or exceeds the performance of other wood preservatives. It can provide a service life of up to 35 years or more, depending on wood species, size and service conditions. (Emphasis added.)
{¶ 84} The record furthermore reflects that although the city decided to purchase copper naphthenate poles for use in its system, the city never specified the use of M-Guard, OMGA's brand of copper naphthenate, in any of its contracts with its general contractors or with its pole suppliers. Thus, the city failed to establish that it justifiably relied on OMGA's representation regarding M-Guard.
{¶ 85} Moreover, the record contains testimony that Cahaba and Olon Belcher had treated poles with copper naphthenate from another manufacturer, Chapman, in addition to that manufactured by OMGA; yet the record reflects that the city's expert, Dr. Burke, made no attempt to quantify the poles treated with OMG's copper naphthenate and those treated with Chapman's product. Thus, this record shows the city also failed to establish that its reliance on OMGA's representationproximately caused the damages arising from the allegedly defective poles.
{¶ 86} Accordingly, applying the directed verdict standard of Civ.R. 50(A)(4) and construing the evidence most strongly in favor of the city, we have concluded that the trial court correctly granted a direct verdict on this claim. This assignment of error is not well taken.
{¶ 87} On the basis of the foregoing analysis of the statutes of limitations, the city's lack of evidence regarding the seventy-one poles and its fraud claim, we have concluded the trial court did not err in its dispositions of the city's claims as presented for review in Case Nos. 78706 and 78871.
Judgment affirmed.
It is ordered that appellees recover of appellant their costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
JAMES D. SWEENEY, P.J. CONCURS DIANE KARPINSKI, J. DISSENTS (See separate Opinion).
 APPENDIX ASSIGNMENT OF ERROR NO. I THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT ON ALL CLAIMS BASED ON THE CITY'S SETTLEMENTS WITH AND RELEASES OF THIRD PARTIES IN UNRELATED LITIGATION.
 ASSIGNMENT OF ERROR NO. II THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT BASED ON THE CONTRACTUAL LANGUAGE OF THE C-5 AND C-9 CONTRACTS.
 ASSIGNMENT OF ERROR NO. III THE TRIAL COURT ERRED IN EXCLUDING THE EXPERT TESTIMONY OF THE CITY'S EXPERT DR. WILLIAM SMITH.
 ASSIGNMENT OF ERROR NO. IV THE TRIAL COURT ERRED BY PRECLUDING THE CITY FROM USING DEPOSITION TESTIMONY OF CERTAIN EXPERTS DURING ITS CASE-IN-CHIEF.
 ASSIGNMENT OF ERROR NO. V THE TRIAL COURT ERRED IN GRANTING SUMMARY JUDGMENT AND/OR DIRECTED VERDICT ON THE CITY'S TORT-BASED CLAIMS.
 ASSIGNMENT OF ERROR NO. VI THE TRIAL COURT ERRED IN GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF APPELLEES, RULING THAT THE ECONOMIC LOSS DOCTRINE PRECLUDED THE CITY FROM RECOVERING ITS COSTS OF INSPECTION, REPAIR AND/OR REPLACEMENT FOR POLES THAT DID NOT CAUSE PROPERTY DAMAGE TO OTHER THAN THE POLES THEMSELVES.
 ASSIGNMENT OF ERROR NO. VII THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN FAVOR OF OMG ON THE CITY'S EXPRESS WARRANTY AND FRAUD CLAIMS.
 ASSIGNMENT OF ERROR NO. VIII THE TRIAL COURT ERRED IN GRANTING A DIRECTED VERDICT IN FAVOR OF APPELLEES ON THE CITY'S CONTRACT-BASED CLAIMS.
 ASSIGNMENT OF ERROR NO. IX THE TRIAL COURT ERRED IN DIRECTING A VERDICT IN FAVOR OF APPELLEE WESCO.
 ASSIGNMENT OF ERROR NO. X THE TRIAL COURT ERRED IN RULING THAT RES JUDICATA BARRED CERTAIN OF THE CITY'S CLAIMS AGAINST APPELLEES LEADER AND OM GROUP, INC.
 ASSIGNMENT OF ERROR NO. XI THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE AT TRIAL TO THE PREJUDICE OF THE CITY.
[1] GCNA, the Guarantee Company of North America, was the 100% reinsurer of the performance bond issued in connection with the C-9 contract between the city and Tucker. When Tucker defaulted, it stepped in and completed Tucker's obligations under the contract.
[2] GCNA sued the city in the District Court for the Northern District of Ohio in connection with claims arising out of its involvement in the C-9 contract; the city counterclaimed and also filed a third-party complaint against its engineers, Beck and Polytech; in separate litigation, Myers sued the city on the C-5 contract, and the city filed a counterclaim.
[3] On December 10, 1997, the city dismissed Norpac, the party who had supplied Leader with poles under the C-9, but not the C-5, contract, from the Thomasson litigation; counsel for the city then orally moved to withdraw its C-9 claims but never filed a written motion to dismiss them. The parties and the court then considered the case to consist of only the C-5 and the requirements contracts. The trial court, however, clarified in its September 6, 2000 order, that mere statements by counsel did not constitute a dismissal and, therefore, in absence of a written motion, the C-9 contract claims had remained pending in that suit.
[4] The court left for further adjudication cross-claims of OMG and OMGA against Cahaba but included in its entry the "no just cause for delay" language of Civ.R. 54(B).
[5] We set forth these assignments of error in the Appendix to this Opinion.
[6] The Ohio Supreme Court held, in State ex rel. Ohio Academy of TrialLawyers v. Sheward (1999), 86 Ohio St.3d 451, 715 N.E.2d 1062, that Am.Sub.H.B. No. 350, 146 Ohio Laws, Part II, 3867 violated the one-subject provision of Section 15(D), Art. II of the Ohio Constitution and was unconstitutional in its entirety. Subsequently, section 3(A)(3) of S.B. 108 revives and amends the pre-H.B. 350 version of R.C.2305.10.
[7] R.C. 2305.09(D) pertains to injuries neither arising on contract nor enumerated in R.C. 2305.10; since we have R.C. 2305.10 claims presented, R.C. 2305.09(D) is not applicable here.
[8] For the requirements contract, which involved multiple transactions and shipments, the trial court, rather than measuring the statute of limitations by the date of last shipment under the requirements contract, applied a separate limitation period for each shipment. We agree. See, also, International Periodical Distributor v. Bizmart (Feb. 1, 2001), Cuyahoga App. No. 77787, unreported; 43 U.C.C.Rep.Serv.2d (Callaghan) 1173 (in an action on an account, the statute of limitations is measured by the limitations period for each separate transaction).
[9] This expiration date also applies to the OPLA claims involving economic loss relating to those seventy-one poles.
[10] As to the C-9 claims, the city did not claim they were refiled by operation of the savings statute; therefore, for the statute of limitations purposes, it was undisputed that the C-9 claims were presented on the date of the city's filing of the Norpac complaint, i.e., September 10, 1999.
[11] As we have noted, the only claims that had not expired at this date were the UCC warranty claims for seventy-one poles and for the fraud claim.
[12] Civ.R. 50(A)(4) states:
 When a motion for a directed verdict has been properly made, and the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party, the court shall sustain the motion and direct a verdict for the moving party as to that issue.
[13] The elements required for a common law express warranty claim are similar to some extent to those for a fraud claim. See, e.g. Rogers v.Toni Home Permanent Co. (1958), 167 Ohio St. 244, 147 N.E.2d 612 (an express warranty may be defined as an affirmation of fact by the seller of a product or commodity to induce the purchase thereof and upon which affirmation the buyer relies in making the purchase.)